We'll call our third case of this morning. Numbers 19-1772 and 73. Cirko v. Commissioner of Social Security and Bazar v. Commissioner of Social Security. Messrs. Saltzman and Sutton. Take your time. Whenever you're ready, Counsel. Good morning, Your Honor, and may it please the Court, Josh Saltzman on behalf of the Commissioner. With the Court's permission, I'd like to save four minutes for rebuttal. Surely not. It's a fundamental principle of administrative law that arguments that are not timely presented to an administrative agency are forfeited and not available on subsequent judicial review. That principle applies with full force to appointments clause challenges. Now this, what we have here, Sims tells us that exhaustion is not required, at least at the appeals counsel, if it's an inquisitorial rather than an adversarial proceeding. And clearly Social Security is one where the ALJ inquires rather than merely decides between two adversaries. Absolutely, Your Honor, but as you rightly point out, Sims was limited to the appeals counsel level. If you see page 107 of that decision, the Court explicitly said it wasn't deciding whether or not you needed exhaustion before the ALJ. And I'd note since Sims, every court of appeals to have considered the question, including the First Circuit in Mills v. Abtfeld, the Ninth Circuit in Shabani, and the Sixth and Eighth Circuits as well, have all read Sims not to preclude a finding of waiver when there was no presentation at any time at all before the agency. Is it also the case that the appellate judges here that compose the appeals counsel were also deemed inferior officers and unconstitutionally appointed? The appeals counsel members were appointed in July of 2018 at the same time that the ALJs were appointed, yes. So prior to that, they had not been. So the same constitutional defect that plagued the ALJs was also inherent in the appeals counsel? You know, that hasn't been briefed here. I will say that they hadn't been appointed as of July 2018 and then were appointed on a going forward basis at that point, yes. So how could it be if there was not constitutional power in either of the two avenues available within the agency for a litigant to seek relief that there could be deemed some requirement to exhaust? So two responses to that, Your Honor. One is there was constitutional power within the agency itself to fix this because the commissioner had the power to make the appointment and indeed has since exercised that power. So if you alert the agency by raising the issue, you flag the issue for the agency, this was something the agency had the power to correct. But the litigant doesn't have access to that, right? I mean, the two steps that the litigant can take before going to the district court are simply the ALJ and the appeals counsel. You're saying that there's an exhaustion requirement because a litigant should hope that an ALJ or someone on the appeals counsel will then turn around and lobby the commissioner themselves?  There's no access, as far as I'm aware, to the commissioner directly. But if you look at the L.A. Tucker decision from the Supreme Court, for example, there is a notion recognized in that that the agency, as a unit, instead of looking at the individual adjudicative members through the process, and you look at the agency as a whole and say that the agency is entitled to notice of the issue, to have it flagged, and to be made aware of its accumulating litigation risk. If I might return to the other point I wanted to make... But the L.A. Tucker, wasn't that adversarial? It was, Your Honor. But the underlying principle there, I think, still carries over. The other thing I'd want to direct Your Honor's attention to is the LGIN decision from the Supreme Court, which recognizes that there can be an obligation to raise a constitutional issue before an agency, even if the agency is powerless to address it. And that's, as I said, not the case here because the commissioner did have the power to make the appointment, and indeed has since made the appointment. But LGIN... I'm sorry, where are you? Finish your sentence. No, I was just going to say LGIN, in Part 5 of that decision, assumed that the Merit Service Protection Board was powerless to address the constitutional question there and nonetheless said that there was value in requiring that the claim be presented before the agency. Can a claimant appeal directly from the ALJ to the district court whose constitution is used for judicial review under 20 CFR 404-900 and 416-1400? So could the petitioners have sought direct review of the ALJ's constitutionality? I'm not sure, Your Honor. We haven't briefed that. Candidly, I'm not sure. We're not relying on that provision specifically as an avenue here. But we do think that the issue could have been presented to the ALJ and thereby giving the agency notice and preserving the argument for review. The other important thing I want to highlight here is to the extent that the district court here relied on its discretion to excuse a forfeiture, we think the equitable analysis there was quite misguided because the court failed to give proper account for the really significant impact that this is going to have on real individuals who haven't even had a first ALJ hearing yet, who already face substantial wait times. Let's talk about that. So what are the statistics? I think your briefing makes reference to thousands of these cases. When we look at the numbers in the courts of appeals in the last few years, it's in the hundreds. In terms of querying our clerk of court, we find maybe a few dozen that are pending in our court. So I'm trying to understand where your numbers come from and how they square with ours. Sure. When you say, just to make sure I address you properly, are you saying dozens of SSA cases in general or specifically cases with these forfeited Lucia claims? For example, 35 pending cases in our court now. That's correct, Your Honor. So the way the numbers work is this. The ALJs were appointed in July of 2018. On the district court's logic, every single person who received an ALJ hearing before July of 2018 is entitled to come to district court, raise an appointments clause challenge, and get a new hearing. The agency adjudicated on the order of 450,000 ALJ cases there. But we haven't been applauded with these cases since July 2018. Where's the evidence that if we rule against you, we will be? Right. So there's a significant lag time because before seeking judicial review, the next step is to go to the appeals council. Appeals council review can take in excess of a year. So there's a significant lag time that's built in. Mr. Circo and Mr. Bazar had their ALJ hearings back in 2015 and 2016 respectively. So there's still a significant body of cases that are still in the process of working their way through the system where after they clear the appeals council level, those claims could presumably be raised for the first time. Only if they're not time barred, right? I mean, you're saying every case before 2018, but there will be cases that were closed and the time for appeal to the district court has expired. Absolutely, Your Honor. We're not saying every case going back to 2000 or whenever. But if you think of the fact that the agency is issuing maybe 450,000 ALJ opinions a year, Mr. Circo and Mr. Bazar were respectively in 2015 and 2016. You still have two or three years of cases that are working their way through the system, have to clear the appeals council, and then could be timely presented in district court. But Your Honor is right that there would be some limitation imposed by that, but not enough to prevent a potential significant impact on the agency and significantly longer wait times for folks who haven't even had one ALJ hearing yet. I found it interesting that you note on page 24 of your brief that Mr. Circo and Mr. Bazar somehow should have been on notice that the ALJs may be unconstitutional before the Lucia opinion came down from the Supreme Court. But folks like these are often, probably most often, unrepresented by counsel, or are they not? I think the figures quoted in the red brief is 28% are unrepresented, and that wasn't Mr. Circo or Mr. Bazar. But having once upon a time participated in this type of process going back 40 years, I don't even know how the attorneys necessarily would know pre-Lucia that there was a big issue. I can tell you that this issue was very much percolating through the courts. It was being raised at an array of agencies, and I think we note in the ManBac case going back to 2015, there was an appointments clause issue raised with regards to an ALJ. Were both Circo and Bazar represented throughout the entire process? I believe so, Your Honor, but I defer to his counsel on that. Do you agree that the question of issue exhaustion is properly evaluated on an issue-by-issue basis? I do, Your Honor. I think you do have an obligation to present your specific claims to the agency. So how do we, when it comes to the constitutionality of the appointment itself, of the agency process, you pointed us to Elgin, but how do you square the argument you're making with McCarthy and the examples that are given there that say there's, when you're dealing with the considerations of the individual rights, which are behind the appointments clause, that you need not exhaust if the issue is one, for example, where it's the agency's own process and the validity of that process, or the constitutionality of the statute, something that falls outside the agency's expertise. And they even give the example from McNeese for supportive education, where they say that students didn't need, for purposes of desegregation, didn't need to petition the superintendent, because the superintendent didn't have the power himself to make the change, even though the superintendent, in turn, could have turned around and asked the attorney general to act. Why isn't that on all fours with the case before us? I think the distinguishing feature, to the extent that Elgin does not modify some of those principles, I do think the distinguishing feature here is that the agency did have the capacity to make the appointment here. And I think that bedrock principles of normal administrative exhaustion requirements reflected in principles like L.A. Tucker should carry here, because this wasn't a case where the agency was powerless to act. Do we look at it from the perspective of people within the agency or from the perspective of the litigant? Isn't the exhaustion requirement a burden that's placed on the litigant? So you have to look to what opportunities, what avenues are available to the litigant. I don't think L.A. Tucker is written in those terms, Your Honor. I think L.A. Tucker talks about fairness to those who conduct the adjudication, and it talks about the right of the agency to be put on notice of its accumulating litigation risk. So I do think we can think about this in terms of what notice the agency is entitled to. When folks don't raise these arguments, the agency is not made aware of its accumulating risk. And I want to emphasize again, the cost of their rule is principally borne not by the agency, but by the folks who haven't even had even a first hearing and will face longer wait times. I see my time is up. Thank you. We'll get you back in the rebuttal. Mr. Sessions. Did you have another question for us? I'm just kind of curious how your clients pronounce their names. Bizzari and Circo, Your Honor. Bizzari. Yes. May it please the Court, I'm Thomas Sutton, and I do represent Andrew Circo, the widower of my late clients, Andrew Circo and John Bizzari, in this appeal. We're here because— One question, just for factual— Yes. Just to pick up on where we left off with your opposing counsel. Were these two persons represented by counsel throughout or partially? They were, and that was me. You're looking at him. And so obviously the implication is somehow this percolating issue, as Mr. Saltzman says, you should have known about and raised even pre-Lucia decision of the Supreme Court. Excuse me, Your Honor. Yes. The notion that this was percolating in the social security context is not correct. He mentioned this Manbeck case. That is not a claimant's case. That's a single case involving an attorney who had been charged with sanctions by the agency and was throwing everything but the kitchen sink back at the agency to try to avoid the sanctions. That was never resolved by the district court. It was all by itself. There were no other cases in which anyone challenged social security ALJs as being inferior officers not having been constitutionally appointed prior to the government's change of position in Lucia. Remember, the government opposed Mr. Lucia even through OPSERT. It changed its position only during the pendency of that case prior to argument and then the decision of the court. Are you abandoning any argument that the issue was prejudged by the agency? Your Honor, the agency may well have prejudged it. We can't know that for sure. We know that when it became apparent to the agency in January of 2018 that this may affect them and their ALJs. They put out an emergency message. Notably, that is not public. That is not in the Federal Register. Claimants and attorneys have no idea these messages exist. Only ALJs and specific officials at social security get these messages. But the message said, if anyone raises an appointments clause issue, you are not allowed to comment on it, make a ruling on it. You can do nothing. Okay? But that was after your client's case. It was, but I believe that was effectively the position of the agency prior to this. The agency did not want its judges ruling on it. Indeed, its ALJs don't have any power to rule on constitutional issues. It's not within their purview. Congress has delegated in the Social Security Act to the commissioner and therefore to the ALJs the commissioner and court. Is there any agency that has ALJs that could grant structural relief? I mean, the import of your argument is that none of these agencies could require issue exhaustion and everyone would always get a new hearing. No, Your Honor. Your Honor, I respectfully disagree in terms of the position we're taking. We're not taking that broad position. For example, in the SEC context, which is where many of these cases came from, there's specific provision in either statute or regulation, I can't remember which, that would require the issue to be raised at a certain point in the proceedings. In Mr. Lucia's case, that was raised before the full commission. It was not raised before the ALJ. Only where there's a statute or reg that requires exhaustion as opposed to one of these. Well, I don't believe the issue, Your Honor, is that broad. Certainly there is no statute or regulation at Social Security that requires exhaustion of this issue, of a constitutional issue generally or this specific appointments clause issue. So what we're looking at is whether there should be judicially imposed exhaustion requirement. We're in the realm of judicial judgment or discretion here. When we're thinking about how to exercise that, how is the ALJ and the Social Security Administration supposed to know it has a structural problem that it needs to fix unless it creates incentives for litigants to bring these claims? Well, Your Honor, I would turn that around. The question of is there direct review, which Your Honor asked my colleague, there is not to my knowledge. The question of is an ALJ going to be able to do anything about this if it's raised, it's very clear. At the time Ms. Serco had her hearing and Mr. Bizzari had his hearing, the ALJs did not have a valid constitutional appointment. And had the issue been raised to them, what option did they have? This is a framing issue. ALJ himself can't do anything. That's your argument. Your friend on the other side's argument is, but the Administration as a whole could have done something, and if there's a tidal wave of cases coming at it, would have done something. The Commissioner would have gone and appointed them all. Why is your framing of the question at the ALJ level the right one? Because the entire ALJ core, and indeed the Administrative Appeals Judges at the Appeals Council, all lacked constitutional appointments. So for the ALJ to grant relief was impossible. The ALJ couldn't reassign the case to one of his or her. You're restating your position. I'm taking it to a higher level, which is why should we be looking at the level of the ALJ and not at the level of the agency? Your Honor, I believe your question would presuppose that my clients would be part of some wave of claimants and that they should all act in concert and that somehow that would convince the Commissioner to take action two or three years prior to the point that she finally did. I don't believe that is required of my clients in this situation. They are not a class. They are individual claimants. And the point, as Judge Ambrose raised, is really important here. Social Security is different from these other agencies that you're looking at. Fully 28 percent over 200,000 claimants in the most recent fiscal year were unrepresented by counsel at their administrative hearings. So a rule, the broad sweeping rule that the government seems to seek here, that everything is waived and everything is forfeited if it's not raised before the ALJ, even constitutional issues, seems particularly inappropriate as a matter of judicially imposed doctrinal prudential thinking. If we then go to the question of who are you raising this issue to, you're raising it to someone who does not have a valid constitutional position, has now been conceded by the government. How can you forfeit your constitutional rights as a claimant before a judge who doesn't? Okay, so let's talk about your constitutional rights here. The government says structural issues are different, right? This is not about a biased hearing officer or something like that. There are some cases that say, well, structural components are there because they also protect individual rights. Can you articulate what the your rights portion of this is? What is the scenario in which you are suffering some kind of prejudice because of an appointments clause violation? I believe, Your Honor, the individual's right derives from the structural imperative. Explain. Give me a hypo. Give me a hypo in which your client is worse off because of this. Explain it in just as plain terms as you can. Your Honor, I'm not sure I can come up with a hypothetical different situation. Does it depend on some kind of crony appointments? Is there a way in which you get an inferior or biased ALJ? Well, certainly the Supreme Court has commented about the appointments clause, that it's there because the framers did not want the appointments power broadly distributed without accountability. And so certainly that could raise concerns about what kinds of people end up in this job. And this is a very, very important job. Although, again, remember, it is non-adversarial, it is inquisitorial. And Justice Thomas was very clear in Sims about what that means and the implications of that. So the point here being that maybe phrased another way, if you had 10 ALJs, there is a very, very good possibility that you're going to have 10 of the same decision. And so is it futile to make this a constitutional issue? I'm not sure I follow the question. Let's say somebody was invalidly appointed. Yes. So then somebody becomes validly appointed. Are they going to do anything different? Your Honor, they will have the proper. No, I'm talking about in terms of the merits now. On the merits, there's no necessary correlation between how a judge is going to roll on the merits and the nature of their constitutional power to serve as an inferior officer to the United States. I get that. I'm not sure what else. I'm just saying if you have a new ALJ appointed, properly appointed, what are the chances of there being a different decision on the merits than what happened to these two gentlemen in this case? Well, Your Honor, there are widely varying allowance rates among ALJs in the ALJ Corps. There are over 1,500 ALJs in the United States. And, of course, they're all applying the same law and regulations, but these are medical facts, vocational expert witnesses, a lot of. At what step were these resolved? These were resolved at the ALJ level after admission. At what step? Step four? In both cases, step five. They both went to step five. Okay. That's correct. Counsel, let's tease out a couple issues because I think from the questions that you've heard from my colleagues, there may be a couple distinct ones, and I'm sure we're all curious your answers. One is, is there an individual right? I mean, we have here what has been described or conceded as a structural error. Is a structural error something that is distinct from an individual right and is rather some sort of systemic protection, or is there an individual right to only have a trial before a constitutionally appointed judge? I believe there is an individual right to only have a trial before a constitutionally appointed judge. There certainly is a statutory right under the Social Security Act to have a hearing before an ALJ. That is your right under statute. Because it is now clear, after the CF and the government's change of position, that Social Security ALJs constitute inferior officers to the United States, then it seems to me that the statutory right and the constitutional right have converged. The second question then really goes to harmlessness, right, and the nature of structural error, and perhaps something that your colleague can address as well. Because the nature of structural error is simply, it really is a rule of harmlessness, right? It's that we will assume that it's something that's so fundamental that either the unfairness has infected the entire process, and so it's just presumed to be prejudicial, or even if there are other interests that are involved in protecting the system, there's a recognition that there's also an individual interest. But when it comes to structural error, the Supreme Court has also recognized circumstances. For example, the constitutional requirement that the courtroom be open, where if it's not preserved, then the remedy might be revisited, and then there would be a requirement of showing harmlessness. So what side of the line are we on here? If there were a requirement to show harmlessness, do you agree that that's not a showing that you could make, given that the ALJs were all reappointed? Your Honor, I think that I would start with Lucia. Certainly Lucia found a constitutional violation in terms of the SEC's ALJ that decided Mr. Lucia's case, and it pronounced what the remedy must be, which is a new hearing before a constitutionally appointed ALJ, not the same ALJ who heard the case the first time, and the court stated its reasons for that. I think that establishes that, at least in this context, that the error is considered harmful and must be remedied as a harmful error. Whether we view the constitutional dimension of the issue as one that is structural, that goes simply to the separation of powers, or whether that adheres in an individual who has a right to a hearing before a constitutionally appointed inferior officer of the United States. If you did have to show prejudice, do you agree that you couldn't make that showing? No, I wouldn't go so far as to say that, Your Honor. I believe it's inherently prejudicial to the claimant to have his or her case decided by an officer of the United States who has not been validly appointed as required by the Constitution, which we now know. But that would be to say that there can never be a required showing of harmlessness for structural error, and we know that's not the case because in cases like Weaver, the Supreme Court, where an objection was not preserved, has addressed the issue of prejudice. Your Honor, I can't directly address Weaver. I have not researched that particular issue, but I simply would go back to the question, what did the Supreme Court do just last year in Lucia? It presumed that there was harm to Mr. Lucia, and it ruled that the remedy for the structural violation of the separation of powers in the Appointments Clause was that Mr. Lucia got a new hearing before a different constitutionally appointed ALJ. By the way, not a newly ratified. By the time the case was heard and decided by the Supreme Court, the SEC had gotten around to ratifying its ALJs, just as the Commissioner of Social Security has done here. The Court said that's not enough. It has to be a different ALJ, not the same ALJ now ratified. We have to build the rule of Lucia with Sims, and the Court's recognition in Sims that at least leaving open the question whether something needs to be raised with the ALJ. Yes. And if I may address that, there are well-honored exceptions to the general principle of exhaustion. Again, it's not in the statute of the regulations. The question is, does the Court impose it? And the reason not to do it are several. One you've already mentioned, Your Honor, which is McCarthy, okay, the idea that you've got unavailable administrative remedies in the situation. The other are constitutional issues, and this is incredibly important in the Social Security context. There are a trio of cases, Matthews v. Eldridge, Califano v. Sanders, Weinberger v. Salfie, that stand for the proposition that constitutional issues are not decided in the first instance by these agency officials. They really are for the courts. What makes me nervous, though, is now you're blowing up in a universe of claims, and I thought Freitag said we needed this to be the rare case for exhaustion. How do you draw a line if you're saying, oh, it's constitutional, it all comes in? How do you draw a line that is faithful to the idea that this is rare, this is the exception, this is not a rule? Understood. So, Your Honor, in that context, I'd like to address what my colleague from Justice has said about the numbers of people who have to wait for more hearings. Between 600,000 and 700,000 hearings a year are held by Social Security in recent years. The government has told us only that there are about 150 cases pending in Pennsylvania in the federal courts that involve this issue that could be affected by your ruling. Let's say, let's add in New Jersey and Delaware, let's double that. If you talk about the entire United States, let's multiply it by 10. Let's say there are 1,500 cases in the courts. That's less than two-tenths of 1% of all the cases that this agency adjudicates every year. This is not going to make any appreciable difference in the delay. This is a vanishing number by reference to the universe of cases. Your friend's point, though, is that if there's no exhaustion requirement and there are several years of cases out there that could benefit, if we expand this, you know, word gets around the Social Security bar and we could have tens of thousands of these across the country. Well, this is a clearly, Your Honor, I believe, temporarily limited issue. Again, since July of 2018, when they ratified all these appointments, everything has changed. They've issued this ruling, 19-1P. Everyone is on notice, and there are not going to be these cases making their way to the courts in this context. Your point is it's a one-time thing, but how do we keep it rare and that not all Social Security errors are going to benefit from this? Your Honor, I believe it is rare in the sense that, as I've already said, as an absolute number, perhaps it's not rare, but as a relative number to the numbers of cases that Social Security adjudicates or even that the federal courts entertain, it's between 15,000 and 20,000 cases a year that get filed. If only 150 cases in Pennsylvania involve this issue at this point. We're not looking at a large number of cases. In fact, it's vanishingly small relative to the number Social Security deals with. To follow up on Judge Bevis' question, or maybe it overlaps somewhat, you had stated earlier that because it's a constitutional issue that looking at cases like Matthews v. Eldridge, it's outside the expertise of the agency, and that seems to be an argument that there wouldn't be an exhaustion requirement for a constitutional objection that related to some aspect of the proceeding. Are you saying that any constitutional claim would be excused from exhaustion in the SSA context, or are you limiting that argument to the Appointments Clause context where it goes to the fundamental power of the agency to act at all? I believe that the more narrow point is the one that we are arguing here, that the court does not have to go to rule for my clients to the extent of saying any constitutional objection is not subject to exhaustion, although I think an argument could be made that is not the case here. You really have a narrower ground on which to decide this case. And ultimately, even if you believe that as a general matter, principles of forfeiture should be applied by the courts to a case like this, it still was within the district court's discretion to excuse the lack of forfeiture in these cases, and the district court did not abuse its discretion. So ultimately, I believe the court should affirm the district court, the Chief Judge of the Middle District in this case. And I see that my time is up. Thank you, Your Honors. I'd just like to emphasize a couple of key points, and I'd actually like to begin with this notion of structural error and the idea of whether Appointments Clause claims are special, because the underlying implication, I think, of Mr. Sutton's argument is that Appointments Clause challenges somehow should just be immune from forfeiture. That's what his logic suggests. Yet he highlights the Lucia decision. The Lucia court took pains to note not once but twice that Mr. Lucia had raised a, quote, timely objection before SEC, which was why he was entitled to that remedy that Mr. Sutton highlighted. We know from L.A. Tucker that there was a decision there that the Supreme Court accepted would have been a, quote, nullity had a timely objection been raised, and yet because there was no allegation of specific bias on the part of the adjudicator, merely improper appointment, the Supreme Court held that the claim was forfeited. In Freitag, as Judge Bibas quite rightly noted, the Supreme Court emphasized not that it was a jurisdictional kind of claim that was immune from forfeiture, but rather that the court was, as a matter of discretion, treating this as a rare case where forfeiture would be excused. And our brief compiles any number of decisions from both before and after Lucia finding Appointments Clause claims to have been forfeited, including all four circuits to have ruled post-Lucia have found Appointments Clause challenges to have been forfeited. In the Social Security context? No, no. And that segues me to the next point I want to make, which is I think I've explained why Appointments Clause claims aren't so unique that they should be treated differently. So that raises the question then, is SSA somehow so sufficiently different that forfeiture shouldn't apply there? Now, some of Mr. Sutton's argument suggests that forfeiture should never apply at SSA. That, simply put, you should always be able to come to court because it's an inquisitorial proceeding and raise any argument, constitutional or not, that wasn't presented before the agency because there's no statute or regulation that requires exhaustion at the agency. But the Supreme Court in Sims took care not to endorse that position. And as I noted, every court of appeals post-Sims to have considered the question has in fact held that forfeiture does apply at SSA. So unless this court wants to be the first one to go the other direction, you need to have a narrower reason to say that forfeiture doesn't apply here than simply that it was at the Social Security Administration. So all that's left then is to sort of try to combine those two separate strands and say, okay, maybe Appointments Clause are forfeitable and maybe forfeiture applies at SSA, but Appointments Clause claims in particular aren't forfeitable at SSA. And I just don't see any logical reason for that, especially in light of the fact that the commissioner of SSA, no less than the head of any other agency, the head of department, had the power to correct this deficiency, had the power to make these appointments and indeed has made these appointments and therefore was entitled to notice and an opportunity to correct this defect. Unless the court has questions on that, I just want to finish by emphasizing again the impact that this threatens to have on other individuals. Mr. Sutton isn't particularly concerned because he says not so many cases have been brought so far. What he overlooks is that the overwhelming majority of district courts have not been receptive to these claims and I'm sure that that didn't much quell this. But if there's a decision from this court saying that anybody who comes into district court and breathes the word Lucia gets a new hearing, I think that that could radically affect the agency and compound wait times for individuals who haven't even had a first hearing yet. Thank you very much. Thank you very much, Your Honor. Well done by both counsel. Thank you for being with us. I would like to ask if we could have a note here, have transcript prepared of this oral argument, check with the clerk's office afterwards and just split the cost. Thank you very much and thank you for being with us.